

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEBORAH BROWN, JOHN BROWN,     )
RENE PAYNE and HENRY BROWN,     )
JR, as individuals,     )
                                )
            Plaintiffs,     )
                                )
      vs.     )     No.  07 C 1127
                                )
STONEBRIDGE LIFE INSURANCE     )
COMPANY,     )
                                )
            Defendant.     )

## MEMORANDUM OPINION AND ORDER

This action was brought by plaintiffs Deborah Brown, John Brown, Rene Payne, and

Henry Brown, Jr., beneficiaries of decedent Johnny Mae Davis ("Davis"), seeking declaratory

judgment against defendant Stonebridge Life Insurance Company ("Stonebridge") under

Group Accident Insurance Policy No. 74AB9U2990 issued to decedent, providing accidental

death and dismemberment benefits (the "policy"). Before this court are plaintiffs' motion for

summary judgment and defendant's cross-motion for summary judgment and motion to

strike. For the following reasons, plaintiffs' motion is denied and defendant's motion for

summary judgment is granted.

## Facts[1]

The insurance policy under which Davis was covered at the time of her death pays

benefits for "injury or injuries," which are defined as "accidental bodily injuries ... which

---

[1] The facts contained in defendant's Combined Statement of Material Facts are deemed admitted as plaintiffs
have failed to submit a response pursuant to Local Rule 56.1(a)(3). *See* Malec v. Sanford, 191 F.R.D 581, 584
(N.D. Ill. 2000). However, the facts are largely taken from Davis' medical records, which the parties
stipulated were admissible as evidence, subject only to relevancy objections and any objections under the
Illinois Mental Health and Developmental Disabilities Confidentiality Act, 740 ILCS 110/2, *et seq.*

are the direct cause of Loss, independent of disease or bodily infirmity." The term "loss" includes loss of life. In the "Exclusions" section, the policy states that no benefits will be paid for injury that "is due to disease, bodily or mental infirmity, or medical or surgical treatment of these ..." (plfs' exh. A). The policy does not define disease, bodily or mental infirmity, or medical or surgical treatment.

On April 24, 2006, Davis went to her physician, Dr. Simon Piller, complaining of rectal bleeding (plf's mot. for sum. jdgmt., ¶ 6). Dr. Piller referred her to Dr. Gerald Mingolelli, a gastroenterologist, for an evaluation of hematochezia, or rectal bleeding (id.). On May 1, 2006, Davis' colon was perforated while Dr. Mingolelli was performing a colonoscopy (def's combined stmt. of facts, ¶ 28). Shortly after Dr. Mingolelli perforated Davis' colon, Davis had difficulty breathing. She died a short time later (id., ¶ 29).

Davis' autopsy report stated that she "died as a result of a pneumoperitoneum[2] due to perforation of the colon due to colonoscopy. Hypertensive cardiovascular disease is a significant contributing factor" (id.. ¶ 30).

Davis' medical records indicate that she had suffered from rectal bleeding several times dating back to 1989 (id., ¶ 14). The records also indicate that she had had hemorrhoids, diverticulosis, a colonic polyp, and irritable bowel syndrome at various times over the past 15-20 years (id., ¶¶ 15-16, 21). When Davis underwent a colonoscopy in June 1999, her past medical history indicated she "had a history of diverticular disease, hypertension, arthritis, exploratory laparotomy for bowel adhesions and a partial hysterectomy" (id., ¶ 17). Dr. Mingolelli's records from the May 1, 2006, colonoscopy reflect that Davis' pre-operative diagnosis was "GI blood loss," and her post-operative diagnosis was "diverticulosis, adhesions,

---

[2] A pneumoperitoneum is defined as the presence of air or gas in the peritoneal cavity. See Stedman's Medical Dictionary 1526 (28th ed. 2006).

evaluation of hepatic flexure" (*id.*, ¶ 26). His records also indicate that biopsy specimens were taken (*id*).

After Davis' death, plaintiffs made a timely claim to Stonebridge under her policy, the principal sum of which is $90,000 (*id.*, ¶¶ 11, 33). Stonebridge denied benefits on July 14, 2006, explaining that the injury was excluded from coverage under the exclusion that no benefit is to be paid for injury "due to disease, bodily or mental infirmity, or medical or surgical treatment of these" (*id.*, ¶ 34). Plaintiff Deborah Brown wrote to Stonebridge on August 10, 2006, requesting reconsideration of Stonebridge's decision (*id.*, ¶ 35). Stonebridge thereafter reviewed its decision but ultimately upheld it, notifying Brown of that decision on October 3, 2006 (*id.* ¶ 36). Plaintiffs thereafter filed suit in the Circuit Court of Cook County, seeking a declaration that Davis' death was accidental and did not fall under any exclusion in the policy (*id.*, ¶ 37). Stonebridge removed to federal court on the basis of complete diversity between the parties.

## Discussion

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The court must evaluate admissible evidence in the light most favorable to the nonmoving party; on summary judgment a court may not make credibility determinations or weigh evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must demonstrate affirmatively that there is no genuine issue of material fact that requires a trial to resolve. Celotex Corp., 477 U.S. at 324. Where, as here, the parties file cross motions for summary judgment, each party must still

demonstrate that there are no genuine issues of material fact. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341, 349 (7th Cir. 1983).

Although the cause of Davis' death is not at issue here – the parties agree that Davis died as a result of her colon being perforated during her May 1, 2006, colonoscopy – the dispute is whether Davis' death falls within the coverage terms of the policy. The parties have agreed that Illinois law governs the interpretation of the policy.

Issues of contract interpretation, like those at issue here, are generally questions of law, making them particularly well-suited for resolution by summary judgment. Baker v. America's Mortgage Servicing, Inc., 58 F. 3d 321, 326 (7th Cir. 1995); Sheehy v. Sheehy, 702 N.E.2d 200, 204 (Ill. App. 1 Dist. 1998).

1. Whether the Colonoscopy was Performed as Part of "Medical or Surgical Treatment"

Plaintiffs argue that Davis' death is covered under the policy. First, they claim that the May 1, 2006, colonoscopy was purely a diagnostic procedure, and therefore was not performed as part of "medical or surgical treatment." The difference between treatment and diagnostic care, they contend, is that the former is "the application of medical care to cure disease, heal injuries or ease symptoms," while the latter is "identifying the nature or cause of an illness, disorder or problem" (plf's mot. for sum. jdgmt. at 8). Therefore, plaintiffs argue, the exclusion in the policy would not encompass Davis' colonoscopy.

In support of their argument, plaintiffs rely largely on Pitcher v. Principal Mut. Life Ins. Co., 93 F.3d 407 (7th Cir. 1996). In that case, the plaintiff had suffered from a fibrocystic breast condition for about 20 years (id. at 409). According to the plaintiff's doctor, the condition was "common" and did not require any treatment because "the condition is not one which of itself causes any deterioration in health, nor does it develop into breast cancer" (id).

After the plaintiff's doctor detected lumps in both breasts in July 1992, however, he suggested that plaintiff abstain from drinking caffeine to see if that would help the lumps abate. When plaintiff returned to the doctor six weeks later, having abstained from caffeine, the lumps had not subsided. Plaintiff's doctor then ordered a mammogram, which was performed just days before her health insurance went into effect. Although plaintiff and her doctor both thought that the lumps were the result of her previously-diagnosed longstanding fibrocystic breast condition, the mammogram led to a finding of a malignant tumor in her left breast (*id.* at 410). The insurance company denied Pitcher's claim for reimbursement of her subsequent breast cancer treatments, based on the policy's pre-existing condition exclusion of "treatment or service" received within 90 days of becoming an insured under the policy[3] (*id*).

In holding that the mammogram was not a "treatment or service" for breast cancer, the Seventh Circuit defined "treatment" as taking steps "to remedy or improve a malady" (*id.* at 412) (quoting Shanks v. Blue Cross and Blue Shield, 979 F.2d 1232, 1233 (7th Cir. 1992)). The mammogram was either part of Pitcher's doctor's efforts to evaluate and monitor her fibrocystic breast condition, or a routine diagnostic procedure (*id.* at 413). Plaintiffs here argue that the colonoscopy performed on Davis was akin to the mammogram in Pitcher, because neither test was undertaken to remedy or improve a malady, but rather to provide a visualization of the interior of the body (plf's mot. for sum. jdgmt., at 8). The colonoscopy, therefore, should not fall within the medical treatment exclusion (*id.* at 9).

Stonebridge contends that it is entitled to summary judgment because courts applying Illinois law have defined "medical treatment" as "something 'performed by a doctor or a surgeon on the body of the patient in the diagnosis of or in preparation for cure.'" Litman v.

---

[3] Plaintiff's health insurance policy having been provided by her employer, the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), governs.

Monumental Life Ins. Co., 682 N.E.2d 135, 139 (Ill. App. 1 Dist. 1997) (citing Provident Life & Acc. Ins. Co. v. Hutson, 305 S.W.2d 837, 839 (Tex. Civ. App. 1957). Since Davis was suffering from a bodily infirmity (rectal bleeding), when she died, the colonoscopy was "part of the diagnosis and preparation for cure of Ms. Davis' medical condition of rectal bleeding" (def.'s reply at 11).

Stonebridge argues that with the Litman decision, Illinois law has been settled on this issue. In Litman, after the decedent had undergone two surgeries, a feeding tube was inserted in preparation for a third surgery. 682 N.E.2d at 137. After that surgery the tube shifted and pierced her heart, causing cardiac arrest and ultimately death (*id.*). The court found that the feeding tube was part of an "ongoing process that constituted an important part of her treatment" (*id.* at 138). The court also found that the feeding tube was "essential" to decedent's well-being and recovery because it enabled her to undergo the third surgery (*id.* at 139). Her death therefore fell under the exclusion for losses resulting from medical or surgical treatment and benefits were properly denied.

In another case applying Illinois law, the decedent, Brooks, went to his doctor complaining of stomach pain and swelling in his lower extremities. Brooks v. J.C. Penney Life Ins. Co., 231 F. Supp. 2d 1136, 1138-39 (N.D. Ala. 2002). After an X-ray showed a significant right pleural effusion, the doctor recommended a diagnostic CT scan of the chest because of the decedent's chronic smoking and history of a questionable lung mass (*id.* at 1139). After the scan was performed, Brooks died, either as a result of an anaphylactic reaction to the type of dye used to facilitate the scan or as a result of his pleural effusion and possible lung cancer (*id.* at 1139).

The court found that while the purpose of the CT scan was to diagnose the source of Brooks' complaints, the scan "'was essential to [Mr. Brooks'] well-being and recovery' from whatever infirmity was causing the problems of which he had complained. It was 'something performed by a doctor or surgeon on the body of the patient *in the diagnosis of or preparation for cure*'" (*id.* at 1143-44, citing Litman, 682 N.E.2d at 139) (emphasis in original). Since the scan was performed in the course of "medical or surgical treatment" of a "disease" or a "bodily or mental infirmity," the damages caused by the CT scan fell within the exclusion (*id*).

It appears that Illinois courts have followed the general trend of interpreting "treatment" broadly in the context of an insurance policy. "Based upon the Litman opinion, and the case law cited therein, it appears that the Illinois courts recognize that medical treatment exclusions also refer to diagnostic procedures." 231 F. Supp. 2d at 1143; *see also* Rich v. Principal Life Ins. Co., 875 N.E. 2d 1082, 1095 (Ill. 2007); Reid v. Aetna Life Ins. Co., 440 F.Supp. 1182 (S.D. Ill. 1977), *aff'd without op.*, 588 F.2d 835 (7th Cir. 1978); Whetsell v. Mutual Life Ins. Co. of New York, 669 F.2d 955, 956 n.1 (4th Cir. 1982) (collecting cases); 10 Couch on Ins. § 141:91 (3d ed. 2008) ("[w]hile the word 'treatment' in its strictest medical sense probably excludes some preliminary steps, especially procedures which a medical professional would categorize as 'diagnostic,' the courts have not generally recognized such a distinction. Instead, the typical judicial approach has been to view "treatment" broadly, as any activity or procedure which is a logical component of the entire process by which a medical professional would respond to a patient's complaints" (citations omitted)).

It is possible that a routine colonoscopy might not be "treatment," as it is widely recommended as a screening mechanism for colon cancer and other health problems, even where the patient shows no symptoms. That was not the case here, however, and so we need

not identify the line between a purely diagnostic procedure and treatment. Davis' rectal bleeding was a bodily infirmity, the evaluation and treatment of which required the colonoscopy. Therefore, while plaintiffs are correct that the colonoscopy itself was merely a visualization of the interior of Davis' body, it was undertaken in preparation for treatment of Davis' rectal bleeding.

In this respect, Pitcher is distinguishable from the instant case. Pitcher went to see her doctor for a routine physical examination. The doctor suspected that the lumps he felt were simply a repeat manifestation of her longstanding fibrocystic breast condition, which did not cause any deterioration in health. Had the lumps remained present but non-cancerous after Pitcher abstained from caffeine, there would have been no need for further treatment. Indeed, Pitcher's doctor did not order any followup to the mammogram for Pitcher's right breast, which showed only non-cancerous lumps (the cancerous tumor was in her left breast). Pitcher, 93 F. 3d at 409.

In Davis' case, plaintiffs have failed to show the same type of harmlessness of her rectal bleeding. Rectal bleeding can be a sign of digestive system disease, hemorrhoids, or a more serious disease such as colitis, Crohn's disease, or cancer. American Medical Assn., Complete Medical Encyclopedia 1055 (1st ed. 2003). "Any rectal bleeding requires prompt medical attention" (id.). Indeed, Davis had been treated in the past for rectal bleeding and related conditions. Moreover, neither Pitcher nor her doctor knew she was suffering from breast cancer, whereas Davis' infirmities had been documented for some 20 years. Therefore, even though the colonoscopy was diagnostic in the sense of trying to determine the cause of the rectal bleeding, it falls within the Seventh Circuit's definition of "treatment" as taking steps "to remedy or improve a malady." Pitcher, 93 F. 3d at 412.

For this reason, <u>Brooks</u> is factually more similar to the case at bar than <u>Pitcher</u>. Like the plaintiff in <u>Brooks</u>, who complained to his doctor of abdominal distention and swelling in his lower extremities, Davis went to see Dr. Piller complaining of rectal bleeding. In both cases the patients had medical histories suggesting further diagnosis and care were needed. The plaintiffs here claim that <u>Brooks</u> is distinguishable because the CT scan was performed after the patient had been diagnosed with a right pleural effusion. The doctor in <u>Brooks</u>, however, said he ordered the CT scan "to make sure there's no intrathoracic process going on." <u>Brooks</u>, 231 F. Supp. 2d at 1139. That is, the doctor ordered the CT scan to better understand the cause of Brooks' pleural effusion in order to treat it. Similarly, Davis had rectal bleeding, a bodily infirmity, when she went to see Dr. Piller. Like the CT scan in <u>Brooks</u>, the colonoscopy was "performed by a doctor or surgeon on the body of the patient in the diagnosis of or preparation for cure" (*id*. at 1143).

Plaintiffs' attempts to distinguish <u>Litman</u> are unavailing. They claim that there was a vital difference in the language in the insurance policy exclusion in <u>Litman</u> that renders the case distinguishable: The exclusion was of "[s]ickness or its medical or surgical treatment, *including diagnosis*" (emphasis added). Stonebridge's policy fails to state explicitly that diagnosis is part of the exclusion. The phrase, "including diagnosis," however, had no bearing on the outcome of <u>Litman</u>, and the court did not discuss it. It therefore does not affect the applicability of <u>Litman</u> to this case, as the <u>Brooks</u> court also noted. 231 F. Supp. 2d at 1141 n.7.

It is true that the feeding tube in <u>Litman</u> differed from the colonoscopy because it provided necessary nourishment to the decedent, whereas the colonoscopy merely provided a visualization of the inside of Davis' body. However, we disagree with plaintiffs' contention

that the colonoscopy was not essential to Davis' well-being and recovery. It was required to determine the cause of her rectal bleeding. Although the decedent in <u>Litman</u> was in a far more serious condition than Davis at the time of her death, they were both undergoing "treatment," as defined by Illinois law.

## 2. Whether "Treatment" is an Ambiguous Term

Plaintiffs' second argument is that the term "treatment" is ambiguous and therefore, under Illinois law, must be construed liberally in favor of coverage. Since Stonebridge did not exclude "death due to accidental complications from diagnostic procedures," and reasonable minds might disagree about whether "treatment" includes diagnostic care, plaintiffs argue that this ambiguity should be construed against Stonebridge as the drafter (plf's mot. for sum. jdgmt., at 10-11).

Stonebridge responds that the term is not ambiguous under Illinois law because it has consistently been interpreted to bar coverage in situations similar to the one here (def.'s reply at 12). Recently, the Illinois Supreme Court considered whether the language in a disability insurance policy similar to that in the Stonebridge policy was ambiguous. <u>Rich</u>, 875 N.E. 2d at 1090. The policy in <u>Rich</u> defined "sickness" as an injury "which is a direct or indirect result of physical or mental infirmity, illness or disease of any kind, or medical or surgical treatment therefor" (*id*. at 1085). In that case, the plaintiff tore a ligament in his wrist and, after surgery, his wrist became infected, requiring further treatment. The insurer claimed that the infection was considered an injury resulting from the surgical treatment of plaintiff's initial wrist injury, which meant it was considered a "sickness" under the terms of the policy. Because it was a sickness, the plaintiff was entitled to only five years of disability benefits, as opposed to lifetime benefits (*id*. at 1085).

The court agreed with the insurer's interpretation, holding that its primary objective in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties, as expressed by the words of the policy (*id.* at 1090 (citations omitted)). If the words used in the insurance policy are reasonably susceptible to more than one meaning, they are considered ambiguous and will be construed strictly against the insurer who drafted the policy (*id.* (citations omitted)). Citing <u>Litman</u> with approval, the <u>Rich</u> court found that the infection clearly fell within the "sickness" definition of the policy, because it resulted from the surgical treatment of plaintiff's wrist (*id.* at 1095).

We agree with Stonebridge that the terms of its policy have been interpreted as unambiguous under Illinois law. In <u>Litman</u>, <u>Rich</u>, and <u>Brooks</u>, the courts were able to determine whether the injuries in each case fell under an exclusion that was worded similarly to the one at issue here. Since the language is not ambiguous, it is not appropriate to construe the language in favor of coverage. As discussed, Davis' colonoscopy was properly construed as "medical treatment" within the terms of the policy. Therefore, it falls within the exclusion in the Stonebridge policy.

### 3. Stonebridge's Motion to Strike

Stonebridge filed a motion to strike portions of Dr. Mingolelli's affidavit, submitted by plaintiffs. Since the affidavit is not necessary for our decision on plaintiffs' and defendants' motions for summary judgment, we need not consider the motion to strike.

### 4. Plaintiffs' Motion to Amend Complaint to Seek Attorneys' Fees

Plaintiffs requested leave to amend their prayer for relief to seek attorneys' fees pursuant to § 155 of the Illinois Insurance Code. 215 ILCS 5/155. Because Stonebridge's motion for summary judgment is granted, this request is moot.

## Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment is denied and Stonebridge's motion for summary judgment is granted. This action is dismissed with prejudice.

James B. Moran
**JAMES B. MORAN**
Senior Judge, U. S. District Court

Oct. 14, 2008.
Oct 14, 2008